Mr. Clement. Mr. Chief Justice, and may it please the Court, Aereo's business model is to enable thousands of paying strangers to watch live TV online. Aereo's legal argument is that it can make all of that happen without publicly performing. But Congress passed a statute that squarely forecloses that rather counterintuitive submission, because although the Internet and the thousands of mini-antennas are new, the basic service that Aereo is providing is not materially different from the service provided by the cable company before this Court in 1969. Sotomayor, why aren't they cable companies? They're not. Sotomayor, I'm looking at the — everybody's been arguing this case as if for sure they're not. But I look at the definition of a cable company, and it seems to fit a facility located in any State. They've got a — whatever they have, a warehouse or a building in Brooklyn. The receipt — that receives signal transmissions or programs broadcast by television broadcast stations. They're taking the signals off of the broadcasts. They're taking the signals, right. Right. I'm sorry, they are. Makes secondary transmissions by wires, cables, or other communication channels. It seems to me that a little antenna with a dime fits that definition, to subscribing members of the public who pay for such service. I mean, I read it and I say, why aren't they a cable company? Well, Justice Sotomayor, a couple of things. First of all, I mean, I think if you're already at that point, you've probably understood that just like a cable company, they're publicly performing, and maybe they qualify as a cable company, and maybe they could qualify for the compulsory license that's available to cable companies under Section 111 of the statute. Sotomayor, but this gets it mixed up. Do we have to go to all of those other questions if we find that they're a cable company? We say they're a cable company, they get the compulsory license. Well, no. There's lots of conditions on the compulsory license. And I think the first place, the reason that we haven't been debating about whether they're a cable company is because they don't want to be a cable company. They have a footnote in the red brief that makes it clear. They are not a cable company in their view. They don't want to be a cable company. And I think that's because coming with a cable company, it might potentially get you into the compulsory license, but it brings with it a lot of obligations that come with being a cable company. Scalia, but that's why they don't want it. That isn't the question. Well, here's the other thing is, I think the question is, are they? I don't think they are. That's really ultimately a question under the Federal Communications Act. But here's why, if I could, I think, and Mr. Frederick will certainly speak to this if you want him to, but I think the reason they don't want to be a cable company is because I think their basic business model would not allow them to qualify for compulsory license anyways. Breyer, I'd still like to know the answer to the question in your opinion. And, of course, if you want a reason, I'll give you my reason. If we take the public performance, maybe we run into what Professor Nimmer saw as a problem. Why isn't? A phonograph, what used to be called a phonograph record store, that sells phonograph records to 10,000 customers giving a public performance? It seems to fall within that definition. But if it is, there's no, no first sale doctrine, and it's a big problem. So we could avoid that problem. Now, that's why I'm very interested in the answer, not just what they want. Well, I don't think they are ultimately a cable company, and we could debate that question, but it's not the question before you. So maybe I could give you some comfort about why you don't need to decide that question by telling you. Breyer, perhaps we should remand it, because my reason for wanting to decide it is what I said. And what you've read in their briefs is they, in their supporting amici, have thrown up a series of serious problems not involving them, like the cloud, which the government tells us to ignore, and many others, which make me nervous about taking your preferred route. So that's why I was interested in this question. But, Justice Breyer, I think it's very important to understand that even if they are a cable company, it doesn't make all these problems go away, because they would be a cable company that, by very virtue of what they want to point to, which is their user-specific copies, I don't think they would qualify for the compulsory license. I also think the better way to avoid your concerns is to maybe take them on directly. The reason that the record company is not involved in a public performance is it's not involved in any performance at all. But that's different, of course, from an online music store, which not only provides a download of something, but actually performs it and streams it and allows it live. And that is a basic distinction that's not only recognized by the Second Circuit in the ASCAP case, but it's also recognized in the real world by the way these different services are structured. If you provide downloads of music, you get a distribution license or a reproduction license. If you provide streaming of music, where you also have a contemporaneous live performance, then you also get a public performance license. And the other thing that I'm concerned about, Justice Sotomayor, is your definition. I mean, Justice Breyer has already asked you, said he's troubled about the Phonograph Store and the Dropbox and the iCloud. I'm also worried about how to define or public performance or the performance of a work publicly, which I guess is the better way to do it, according to you. How do I define that so that someone who sells coaxial cable to a resident of a building is not swept up as a participant in this? Or someone who the sort of passive storage advisors? This is really hard for me. Sotomayor, what do I do to avoid, what do we do, not me, but what does the Court do to avoid a definition or an acceptance of a definition that might make those people liable? Okay. Well, let me try to take, those are actually two different examples, and I think the answer to both of them is somewhat different. I think the provider of coaxial cable is, if it's just a simple sale of the cable, is not performing at all. And so I think if you're somebody and all you do is take a piece of hardware and you sell it once and for all to a user, then the user might be performing with the equipment, but you're out of the picture. And that's different from an ongoing service like a cable company or like Aereo, who still owns all these facilities and they're providing, through wired transmissions, these performances on an ongoing basis. Sotomayor, that's the trouble. Kagan, before you get to Justice Sotomayor's second half of the question, but something more along the lines of providing hardware. Suppose a company just gave the antenna and a hard drive. That's what they sold to the user. And the user was able to use the antenna and the hard drive in her own house or apartment in order to get all these broadcast programs. What would the – would that be a performance? I think the end user would be doing a performance, but it would be a purely private performance, and I don't think the person that sold them the hardware, or really anybody else, if I understand your hypo, would be involved in a performance. And the answer to these hypos, I mean, this isn't something that I'm making up on the fly. I mean, it's right there in the text of the statute. Kagan, it really does depend on like where the hardware is. In other words, if Aereo has the hardware in its warehouse as opposed to Aereo selling the hardware to the particular end user, that is going to make all the difference in the world as to whether we have a public performance or not a public performance. Well, and again, I think that goes to what I was about to say, which is that's just not because, you know, we like one better than the other. It's because of the text of the statute Congress wrote. One of the ways that you can public perform, I mean, they start with the classic public performance, right? A singer in a concert hall, they've sold tickets. But then they say, wait, it's also a public performance if you take the singer's performance and you transmit it. And they're thinking over the airways and all sorts of other ways, if you transmit it to the public. And the definition of transmission, then, is to communicate it from one place to another. So there is a geographical aspect, if you will, built right into the statute, so that if you sell somebody hardware and all they're doing is transmitting it to themselves at their home, there's not going to be a transmission that's chargeable to the person who sold you the hardware. But if you provide an ongoing service from a remote place. Kagan.           Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. Kagan. It becomes a public performance on behalf of the sender, but it still would be a private performance on behalf of the receiver. And that's one thing that's really important to get in mind, is that in this statute, as to the public performance right, there's nothing particularly anomalous about a single transmission that from the sender's perspective is a public performance, but from the recipient's perspective only allows for a private performance. If you think about the classic cable context, which is what Congress was trying to address in 1976 with the Transmit Clause, you have the cable company and they're taking a performance off of the airwaves and they're transmitting it to all the end users. Now, the cable company is clearly performing to the public, but that same transmission is allowing each end user to turn on their television set and make a performance pop, which is a private performance. Sotomayor, Roku is paying a license for no reason. I'm sorry?  They sold me a piece of equipment. Clemente, I don't know all the details of that particular piece of equipment. I'm not sure whether they're paying a license or not, but if there was really a transfer and there's nobody else providing a transmission, I don't think that just operating the hardware in the privacy of your own home is going to result in anything but a private performance. Sotomayor, Roku, go to the eyedrop in the cloud. Clemente, sure. Now, there's — it's, I think, a slightly different situation. And here, I think the ultimate statutory text that allows you to differentiate a cloud locker storage from something like what Aereo does is a language to the public. And I do think that in all sorts of places, including the real world, there's a fundamental difference between a service that provides new content to all sorts of end users, essentially any paying stranger, and a service that provides a locker, a storage service. And I think if you want a real-world analogy off the Internet, I think it's the basic decision, the difference between a car dealer and a valet parking service. I mean, if you looked at it from 30,000 feet, you might think, hey, both of these things provide cars to the public. But if you looked at it more closely, you'd understand, well, if I show up at the car dealership without a car, I'm going to be able to get a car. If I show up at the valet parking service and I don't own a car, it's not going to end well for me. And so the difference. Alitos, I didn't mean to interrupt your— Clemente, so I think there is a very real way in which you would say, you know, at the end of the day, the car dealer is providing cars to the public, the valet parking service is not. It's providing parking service. Roberts, and I don't want to stretch it too far, why isn't it like a public garage in your own garage? I mean, you know, you can park your car in your own garage or you can park it in a public garage. You can go to Radio Shack and buy an antenna and a DVR, or you can rent those facilities somewhere else, from Aereo. They've got an antenna, they'll let you use it when you need it, and they can, you know, record the stuff as well and let you pick it up when you need it. Clemente, Mr. Chief Justice, that's not an implausible way to look at this. That's exactly the way that this Court looked at it in the Fort Knightley decision. But Congress in 1976 decided it was going to look at it differently, and it said that if you are providing a service, even if you're providing a service that one could reconceptualize as just renting out antennas that somebody could put on their own house, the person that provides that service on an ongoing basis and in the process exploits the copyright of works of others is engaged in a public performance. That is clearly what they were trying to do in the 1976 Act by adding the transmit clause. Now, the Second Circuit analogized this to its Cablevision decision. So maybe you could explain to me what is the difference in your view between what Aereo does and a remote storage DVR system? Is the difference — does the difference have to do with the way in which the cable company that has the remote storage DVR system versus Aereo acquires the program in the first place? Does it have to do with the number of people who view this program that's been recorded? What is the difference? Clements. I think the potential difference, and it's both the cloud locker storage and this example, I don't think this Court has to decide it today. I think it can just be confident they are different. Here is the difference. Well, I don't find that very satisfying, because I really — I need to know how far the rationale that you want us to accept will go, and I need to understand, I think, what effect it will have on these other technologies. I had the same question. Just assume that Cablevision is our precedent. I know that it isn't, but let's just assume that it is. How would you distinguish the Cablevision from your case? And how is it applicable here? Assume that it's binding precedent. Just that's a hypothetical. Okay. But, Justice Kennedy, I'd like to answer both your questions by assuming that the result in Cablevision is right, but I don't have to necessarily buy the reason. Because I think the reasoning of Cablevision is profoundly wrong. So let me circle back to that. But the reason there's a fundamental difference between the RSDVR at issue in Cablevision and what Aereo provides is, as Justice Alito alluded to, the fact that there's a license in the Cablevision context to get the initial performance to the public. And so then, I think appropriately, the focus in the Cablevision context becomes just the playback feature and just the time-shifting that's enabled by that. And in that context, if you focus only on that, then the RSDVR looks a lot like a locker service where you have to come in with the content before you can get content out, and you only get back the same content. And here's what really I think Aereo is like. Aereo is like if Cablevision, having won in the Second Circuit, decides, whew, we won. So guess what? Going forward, we're going to dispense with all these licenses, and we're just going to try to tell people we are just in RSDVR. That's all we are. And never mind that we don't have any license ability to get the broadcast in the first instance, and we're going to provide it to individual users, and it's all going to be because they push buttons, not because we push buttons. If that were the hypothetical, I don't know how that wouldn't be the clearest violation of the principles. Breyer. Breyer. Assume that it isn't our problem. I'm hearing everybody having the same problem, and I'll be absolutely prepared, at least for argument's sake, to assume with you that if there were ever anything that should be held to fall within the public performance, this should be, all right? I'll assume that. I'm not saying it isn't. But then the problem is in the words that do that, because we have to write words, are we somehow catching other things that really will change life and shouldn't, such as the cloud? And you said, well, as the government says, don't worry, because that isn't a public performance. And then I read the definition, and I don't see how to get out of it. Here's the way to get out of it, Justice Breyer. Ultimately, the words you're going to have to interpret are to the public. Now, I think the public, you see, separate at the same time or at different times. Separate or together. A thousand people store in the cloud the same thing, as can easily happen, and call it back at varying times of the day. And if all they can do is, just like the valet car parking services, get back what they put up there, I think you could easily say that that is not to the public. And that's not just me coming up with a clever distinction. That's the distinction that's really been drawn in the real world, because not all cloud computing is created equal. And there's some cloud computing services that use cloud computing technology to get new content to people that don't have it, and they get licenses. And there's other cloud computing that just has locker services, and they don't think they need a license. And so I'm not saying that you have to bless what the market has done, but I think it's a profound indication. Kagan. What if, Mr. Clement, it's not so simple as a company that just allows you, yourself, to put something up there? What if, how about there are lots of companies where many, many thousands or millions of people put things up there, and then they share them, and the company in some ways aggregates and sorts all that content. Does that count? That, Justice Kagan, is precisely why I'm asking you not to decide the cloud computing question once and for all today, because not all cloud computing is created equal. The details of it might matter. If I can just take my valet parking service one more time. If the valet parking service starts renting them out and sort of has a little zip car service on the side and says, hey, while we have your car, somebody else needs a car, we're going to rent it out to them, I think that's different from the pure valet parking service. If I could reserve the rest of my time for rebuttal. Thank you. Thank you, counsel. Mr. Stewart. Mr. Chief Justice, and may it please the Court. I'd like to begin by reinforcing two of the points that Mr. Clement made. The first is that what area was doing is really the functional equivalent of what Congress in the 1976 Act wanted to define as a public performance. As the Chief Justice said, one potential way of looking at this is that area-owing companies like it are not providing services. They are simply providing equipment that does in a more sophisticated way what the viewer himself can do. It's a plausible way of looking at the world. That's what the Court in Fort Knightley and Teleprompter said, but Congress acted to override that and to make clear that cable services, services that used one big to their subscribers, those people were engaged in public performances and they ought to be paying royalties. The second thing that I'd like to reinforce in Mr. Clement's presentation is that there's no reason that a decision in this case should imperil cloud locker services generally. But as Mr. Clement was pointing out, that the term cloud computing How about Simple TV or Nimble TV, which is not quite a hybrid? I mean, I guess I'm not familiar enough with the precise details of the operation, but just let me say in general terms, there are obviously services that provide television programming over the Internet. Some of them are licensed because they recognize that they are publicly performing. If a particular company, for instance, recorded television programs and offered to stream them to anyone who paid the fee or offered to stream them for free and made its money off advertising, that would be a public performance, because those companies would be providing content to people who didn't have it. I think the basic distinction, the one that at least defines the extremes, is the distinction between the company, whether it be Internet-based or a cable transmitter, that provides content in the first instance, and a company that provides consumers with access to content that they already have. If you have a cloud locker service, somebody has bought a digital copy of a song or a movie from some other source, stores it in the locker, and asks that it be streamed back, the cloud locker and storage service is not providing the content. It's providing a mechanism for watching it.  Kagan. Kagan. Can I ask my same question to you that I asked to Mr. Clement? How about if there's a company that allows sharing and that aggregates all the content that different individual users put up and that in some sense sort of sorts and classifies the content in different ways? How about that? I think you would have to know both the details of the service and you would have to be making a harder call there about how to draw the line, because I don't pretend that there is a bright line between providing a service and providing access to equipment. If you look, for instance, at the extremes of a person putting a rooftop antenna at his own home, everybody agrees that the rooftop antenna manufacturer is not performing at all and the individual is engaged in a solely private performance. At the other extreme is the cable company, one big antenna makes transmissions to a lot of people. Congress clearly intended to define that as a private performance. Somewhere in, but you can come up with lots of hypotheticals that look more or less like one of the other extremes. They're somewhere in the middle. It's an authentically hard call as to where to draw the line. So I don't have a good answer for you. How do we get out of the NMRI example? I mean, how do we get out of, what words do I write to get out of this, of throwing into this clause a music store that distributes via Federal Express a device or the U.S. Postal Service or even someone over the counter, distributes to 10,000 people a copy of a record, which they then will take and play it. They have, to the same degree, transmitted something that will electronically make a performance of the music. So are they, when they sell the record, violating the display clause? No, they're not engaging the display clause. Because? Because the definition of to transmit goes on. To transmit a performance or display is to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent. But of course they are. The sounds are received beyond the place. It requires the person to take the record, put it on a machine, and then play it. Well, there is a separate exclusive right in the copyright act. Of course there is. And that separate exclusive right has such things as first sale doctrine attached. But if they also flow here, if they all – if this covers them, which is why Nimmer wrote the paragraph that was quoted, if this covers it, there is no first sale doctrine. And that has a lot of consequences. I mean, I think so. Anyway, if you don't know and you haven't got something right there and you haven't thought about it, you're not going to think about it in 2 minutes, nor will I. No, no, I have thought about it, and I think the answer is that the word transmit is being used in a particular sense. You are correct that there are some contexts in which we would say that a person who sends CDs or vinyl albums over the mails is transmitting those. That's not the sense in which the term transmit is used here. It's talking about transmitting in a way that causes the sights and sounds to be received, transmission through radio waves, through cable, et cetera. And if there were any doubt about the word transmit, remember that it's part of the definition of the word perform. And ambiguities in the definition should be construed in light of the defined term. And nobody would say in ordinary parlance that a person who transferred a copy of a record was performing it. Ginsburg. Mr. Stewart, before you finish, Mr. Clement, in his brief, made the point that we would be, if we took the position the Petitioner urges, there would be an incompatibility with our international obligations. That is, Aereo's view of the public performance right is incompatible with our obligations under the Berne Convention and under, what is it, WIPO? On pages 44 to 45 of his brief, he says that Aereo's view of what the public performance right is runs straight up against our international obligations. And he cites a case from the European Court of Justice, and I think another case. We haven't made that argument. We believe that existing U.S. copyright law properly construed is fully sufficient to comply with our international obligations. That doesn't mean that we think that whenever a court misconstrues the statute, we will automatically be thrown into breach. It's certainly possible that if this case were decided in Aereo's favor, that some of our international trading partners might object. But I'm not going to take the position that we would concede those objections had merit, so we're not making that argument. The other thing I would say to reinforce the point that Mr. Clement was making about the phrase to the public, using his example of the valet parking, using a comparable example of a coat check room, there are situations all the time in which people place property momentarily at the disposal of another and then retrieve it later. And it's distributed to them at that later date, not in their capacities as members of the public, but as the true owners of the property. And I think some kind of distinction along those lines is essential in much more mundane applications of the Copyright Act. For example, if I invite ten friends over to watch the Super Bowl, that's a private performance. It's not a public performance. That's not because my friends are not members of the public. They are, and in some other capacities, it would be important to regard them as such. If the theater down the street had a screening of Casablanca and it happened that those ten people were the only ten people who attended, it would be a public performance because they would be in their — they're in their capacities as members of the public. So I think for — in a wide range of situations dealing with public performance, distribution to the public, it's essential to ask not only are these individuals members of the public in some sense, but are they acting in their capacities as such. And if you have the pure cloud locker service, the service that doesn't provide content, it simply stores content and then plays it back at the user's request, that — that service would be providing content to its true owner. Kennedy How do you want us to deal with Cablevision, the Cablevision case in the Second Circuit? Again, assume it's a binding precedent. Just assume that. Stewart My answer would be the same as Mr. Clement's, that the reasoning of Cablevision, if you really adhere to the idea that the only — the only performance that counts is the individual transmission and ask, does that go to more than one person, then it's hard to see how you could rule in favor of our position here. But as far as the bottom line outcome of Cablevision is concerned, you could accept the government's position and still say Cablevision was decided the correct way, because precisely because Cablevision had a license to perform in real time, to broadcast the program to its subscribers, the only thing that was at issue was the supplemental RSDVR service. And the court in Cablevision appropriately, we think, held that the recording of those programs by the subscribers who were already entitled to view them in real time was fair use under Sony, and the playback can reasonably be characterized as a private performance of their own content. Thank you. Roberts Thank you, Mr. Stewart. Mr. Frederick. Frederick Thank you, Mr. Chief Justice, and may it please the Court, I want to address the Cable question, but before I do that, can I just say the three points I wanted to make are the text is very clear for Aereo, the interpretations of the text that they offer absolutely threaten cloud computing, and third, this case is really a reproduction right case masquerading as a public performance case. Now, we are not a cable service. The reason we're not a cable service is because cable takes all signals and pushes them down. There is a head end. It's defined by statute. There is a very particularized regulatory structure that deals with taking a lot of content and pushing it down to consumers. Aereo is an equipment provider. Nothing happens on Aereo's equipment until a user initiates the system. The user initiates the system by logging on and pressing, this is the program that I want to watch. That then tunes the antenna, activates the recording that will be made, and then the user is then able to play back the recording. Sotomayor I always thought, and I'm trying to be careful about it, but not often enough probably breach it like every other member of the public, that if I take a phonograph of a record and duplicate it a million times the way you're doing it, and I then go out and sell each of those copies to the public, that I'm going to be violating the act. So why is it that you're not? It's not logical to me that you can make these millions of copies and give – essentially sell them to the public because you're telling the public when they want to buy it, they can call it up and hear it. So why aren't you? Well, your hypothetical, Justice Sotomayor, implicates the reproduction right. That is the exclusive right of the copyright holder to restrict the number of copies that is made. That is not a public performance right question. They abandoned their challenge in the preliminary injunction proceeding to the reproduction right issue because it runs right into the Sony decision. In Sony, this Court held that consumers have a fair use right to take local over-the-air broadcasts and make a copy of it. All Aereo is doing is providing antennas and DVRs that enable consumers to do exactly what this Court in Sony recognized they can do when they're in home, and they're moving the equipment, the antennas and the DVRs, to the Internet. Ginsburg. Was Judge Chin right when he said that there was no technically sound reason to use these multiple antennas? The only reason for that was to avoid the reach of the Copyright Act. Was there a technical reason, instead of having one big antenna, to have all these, what, dime-sized antennas? Let me — this is a very complex question, Justice Ginsburg, and let me answer it at multiple levels. There are technical reasons why the individual antennas provide the same utility at lower cost and functionality than one big antenna. But there are very practical concerns, too. As a startup business, Aereo is attempting to entice consumers to replicate on the cloud what they can do at home at lower cost and more efficiency. As a practical matter, and Judge Chin had no basis in which to make this statement at all in his dissent, because these are facts not on the record, and efficiency is not a consideration under the Copyright Act, you can't do multiple channels over the Internet anyway. You can only do a single video stream at a time. So whether you have one big antenna or whether you have lots of little antennas, you still have to compress the signal and only one can go over the Internet at a time. However, Justice Ginsburg, as a startup business, there is a very real consideration for why multiple antennas make sense. If you're in New York City, you want to put an antenna on top of a building, you've got to get a building permit. If you want to construct it, you've got to get a construction permit. If you want to put it up there with a crane, you have to get a subway permit before you can do all of the things to put a big antenna on a building in New York City to get broadcast signals. Roberts. Roberts. But is there any reason you need 10,000 of them? I mean, can't you put just — if your model is correct, can't you just put your antenna up and then do it? I mean, there's no technological reason for you to have 10,000 dime-sized antenna other than to get around the copyright laws. Well, the point of the copyright laws, though, Your Honor, shouldn't turn on the number of antennas. It turns on whether the person who is receiving the signal that comes through the Internet is privately performing by initiating the act of that antenna, getting a data stream, having that signal compressed so that it can be streamed over the Internet through a user-specific, user-initiated copy. That may well be, but it doesn't contradict the Chief Justice's question. I mean, you're just saying that by doing it this way, you don't violate the copyright laws. But his question is, is there any reason you did it other than not to violate the copyright laws? We understood — yes, there is a reason, Justice Scalia. We wanted to tell consumers you can replicate the experience at very small cost. You know you have a right to put an antenna on your roof and put a DVR in your living room. We can provide exactly the same antenna and DVR for a fraction of the cost by putting it over the clearing. Roberts. Yeah, but it's not, it's not, it's not. You give them space that's available when they call in. They don't have, this is my little dime thing and this is my copy that's going to be here. They're there, and when they want something, you provide the service of giving them that. They don't have a dedicated antenna in Brooklyn. Well, some of the consumers do. The record is clear that some are statically assigned to particular users. But, Mr. Chief Justice, that doesn't answer the question, the statutory interpretation question, which is, as in Cablevision, as Justice Kennedy noted, there is a user-specific, user-initiated copy that when viewed by the user is a private performance. That operation of the system works exactly the same way. And the fact that Cablevision is able to compress its signals to make them Internet accessible through a single antenna, and Aereo chooses to do it through multiple antennas to avoid all the hassles that go with having a big antenna, should not matter for the copyright laws. We're still talking about renting equipment that consumers have a right to get over-the-air signals that are free to the public, using public spectrum that the government has allocated so that broadcasters can see. Kennedy, Suppose Aereo offered a service so that the viewer at home could press three different buttons, but it takes only 45 seconds, and he could get the broadcast without advertising, and Aereo would have some way to screen out the advertising. So you could watch the entire baseball game or football game without the ads. That would probably violate the reproduction right, Justice Kennedy. It would not violate the public performance right. Would Aereo be a performer, then? Aereo would not be a performer. The question would be, and this does go into the technical details, and here the position between the parties is quite stark, they say the facts don't matter, we have a well-developed factual record. There, Justice Kennedy, the fact that would matter in your hypothetical would be whether or not the initiation of the advertiser-free had been somehow done by the consumer or whether it had been done by the cloud provider. Kennedy, No, the consumer makes the choice. You can have it with the ads or without the ads. Push button one or button two. Right. I understand. I don't understand why he's the performer in one case and not in the other case. Because the action of who is a performer turns under the statute on who is making who is acting to make the sequence of sounds and images perceivable. Where you're talking about taking out advertising, what you're doing is you're altering the copy and you are abridging, infringing the reproduction right. That is not something you can do in the area of technology. I have no brief to defend that. That would be a very difficult reproduction right question, but it doesn't matter in terms of who is exercising a private performance, because that is being done in the home with a user-initiated, user-specific copy. Scalia, Mr. Frederick, your client is just using this for local signals. Frederick, Yes. Right now. But if we approve that, is there any reason it couldn't be used for distant signals as well? Possibly. Possibly what? There is possibly a reason, or it could possibly be used? It can't be used for distant signals, but it implicates a difference. What would the difference be? I mean, you could take HBO, right? You could carry that without performing. No, because HBO is not done over the airwaves. It's done through a private service. But, Justice Scalia, let me answer your distant signal hypothetical this way. That would implicate, again, the reproduction right. It does not implicate the private performance and public performance distinction, because even if you were to take distant signals and make them available in the home, it's still through a user-initiated, user-specific copy of distant programming. Right. The question then becomes, is there a fair use right to be able to do that? What Sony said, because Sony was dealing with local over-the-air broadcasts and making a copy of local over-the-air broadcasts, it said that consumers have a fair use right to make a copy of that. Sony did not address the distant signal. And the question then would become, in balancing the various fair use factors, whether it was appropriate for a consumer to be able to get access to that programming without being able to otherwise implicate the free public spectrum. Now, the way Congress has addressed that, Congress has addressed that by saying that when there are distant signals that then get pushed through a cable system, there is a copyright royalty that gets paid. But I want to make absolutely clear, satellite, cable do not pay copyright royalties for local over-the-air broadcasts. Why? Because the local over-the-air broadcast channels wanted it that way. They didn't want to be in a situation of having to figure out how to divvy up all the copyright royalties to the various holders. So when they talk about how Congress supposedly overruled Fort Knightley, what they ignore is that in Section 11D and in Section 122C of the Copyright Act, Congress said the retransmission of local over-the-air broadcasts through satellite and cable shall be exempt from the copyright regime. And so when they talk about the retransmission issue, they're really trying to conflate   Ms. Gifford, would you clarify that every other transmitter does pay a royalty. Maybe it's under compulsory license. And you are the only player so far that doesn't pay any royalties at any stage. Well, Justice Ginsburg, the person who sells an antenna to me at the local radio shack doesn't pay copyright royalties either. And a company that provides a rental service for me to put an antenna in my home and install it, they don't pay copyright royalties either. And the question that really boils down to in this case is how significant should it be, how long the cord is between the antenna and the DVR? Breyer, the answer is very significant. And the reason very significant is because what the local antenna person doesn't do, but you apparently could do even if you don't, is with the same kind of device pick up every television signal in the world and send it almost and send it into a person's computer. And that sounds so much like what a CATV system does or what a satellite system does, that it looks as if somehow you are escaping a constraint that's imposed upon them. And that's what disturbs everyone. And then what disturbs me on the other side is I don't understand what the decision for you or against you, when I write it, is going to do to all kinds of other technologies. And I've read the briefs fairly carefully, and I'm still uncertain that I understand it well enough. That isn't your problem, but it might turn out to be. Well, let me address that. Let me try to make it their problem. I think I've addressed the distant signal, and I think you can reserve that case to say that might raise a different issue, but on the facts here, would not entitle the company to an injunction in joining Aereo from providing the service. Now, with respect to the second aspect of this, the reason why their interpretation of the transmit clause causes so much problem, so many problems for the cloud computing industry, is that it's twofold. Number one, they are conflating performance with work in the transmit clause. What they are saying is that so long as the work is always perceived in some fashion through a performance that is privately done through the playback of a recording, that that, because the initial work was disseminated to the public, that implicates the public performance right. What that does is it means that every time somebody stores something in the cloud, whether it's a song, a video image, or the like, if it happens to be something that somebody else has stored in the cloud, the act of one person initiating it and perceiving it is going to implicate the public performance right. And that's why the cloud computing industry is freaked out about this case, because they've invested tens of billions of dollars on the notion that a user-specific, user-initiated copy, when perceived by that person, is a private performance and not a public performance. The second thing that they do that's wrong with the statute is they aggregate performances. Instead of where the statute says transmit a performance, they say transmit performances, because they acknowledge that the way the technology works for Aereo is it is an individual user-specific, user-initiated copy. But they say no matter if you add enough of them together, you can aggregate that to become a public performance. And that's the issue. Roberts, there's no reason it's a user-specific copy, is it? They're making 10,000 copies. It would be much easier for you to just have to make one copy and everybody could get a copy. Well, that's where the issue about replicating what happens in the home matters, Mr. Chief Justice. Because if I'm in my home and I start the program two minutes in using Aereo's technology, I miss the first two minutes, I never get to watch it. It happens to be when I push the button to initiate the copy, just like if I'm at home watching on a DVR, the same principle. And so that copy will always be different because I have control over it versus Surely you can make a program where you have just one copy and starting it at different times. You don't need every viewer to have his own copy. But that is the key distinction between video on demand and the service that Aereo provides, the kinds of equipment and technology that Aereo provides. We don't have a brief to defend the master copy, because in the master copy situation, that is indisputably public, because there is no right to exclude anyone else. With Aereo's technology, if I'm making a copy using Aereo's system, no one else can look at it. Even if you happen to have watched the same program, you can't watch my copy, I can't download it. Roberts, you're saying your copy is different from my copy. Correct. Well, that's the reason we call them copies, because they're the same. All I'm trying to get at, and I'm not saying it's outcome determinative or necessarily bad, I'm just saying your technological model is based solely on circumventing legal prohibitions that you don't want to comply with, which is fine. I mean, that's, you know, lawyers do that. But I'm just wondering why — whether you can give me any technological reason, apart from compliance with the particular legal regime, for your technological model. It is much simpler if you're a startup to add components, to add modules, when you are starting up, ramping up. And what we're talking about in any cloud computing industry is you are starting with one group of servers and then you add them, almost like Lego pieces, as you are adding the number of people that you're using. That is a technological reason why the cloud works the way it does, Mr. Chief Justice. So with Aereo's antennas and its DVRs, we can, with about the length of the size of this counsel table here, service tens of thousands of people in the New York area. We can provide the antennas and we can provide the DVRs, and it's a very compact, small space. And then if we expand and we're able to continue to be in business and we get more subscribers in Brooklyn, we might add another row that would be the size of the counsel tables behind me. That aspect of the technology goes to the modules that are used for cloud computing, where you basically can add additional servers, add additional hard disk space. And then when new consumers activate, and let me just be clear about this, when they sign up, their system is completely empty. There is no content being provided. There is equipment that's being provided. So when they activate the system and they say, I want to watch the news at 6 o'clock, they then start the process that then fills their individually assigned storage with the 6 o'clock news. But until that happens, there's no content being provided. So the notion that they have in the reply brief over and over that we're somehow a content provider would mean that everybody who provides an antenna or a DVR is somehow a content provider. And if that's true, then the implications for the equipment industry are obviously quite massive, and you can understand why that would frighten the cloud computing industry, because that turns them into public performers whenever they are handling content. Now, the government says they give the subscriber a menu and says, you can get any of these things. It's not as though the subscriber initiates it. You have these choices, and they are providing you these choices, and those choices are content. It's no different, Justice Ginsburg, that if I'm at home and I have an antenna or rabbit ears on my TV and I know what channels I can get. Kagan It's no different from a user's perspective. It's exactly the same as if I'm watching cable, right? You just have a different content selection. But it looks the same to you. Somebody else is providing you with a menu, and then you pick off that menu. Frederick Right. But the menu, Justice Kagan and Justice Ginsburg, is simply what is technologically available. There are broadcast signals that are available in a local area, and they are limited because that's what the broadcasters make available. And simply providing a user guide that says you can tune to this channel or you can tune to that channel if you want to pick up one program or another can't be the difference between a content provider and merely facilitating the use of your equipment. Breyer Would you explain in a sentence or two, which will sound as if I'm favoring with you, but I want them to have a chance to reply. The thing that frightened me somewhat in your brief was I think of the cloud storing everybody's music, vast amounts of music. And now they then send it down perhaps to a million people at a time who want to all hear the same song. Now, what you said was, if I understood it, but explain it if it is, that there is a provision of the copyright law that says when that happens, it's subject to a compulsory license. And if it's subject to a compulsory license, then of course people can get it and it's paid for by somebody. But if we decide with them, there would be a different provision that would come into play, namely the performance, and it wouldn't be subject to the compulsory license. There's no point telling me I'm right if I'm wrong. What I want to know is, am I — is if I got your argument correctly, and if not, what is it? Frederick I think that your argument, Justice Breyer Breyer It's not my argument. It's a parody perhaps or an incorrect version of yours. What? Frederick Okay. Let me try to correct this. There is no compulsory license with respect to music or video. There are different compulsory licenses with respect to satellite and cable that capture all signals and push them down to everyone. Breyer All right. So that would be the same. Now, it isn't going to be a problem. Frederick No. Where it's going to be a problem with the cloud is if you say, if I'm watching a particular program and you're watching a particular program and Justice Sotomayor is watching the same program, we are engaging in the company that has allowed us to make a copy of that is engaging in public performance. Where you have to deal with infringement is the concept of — of volition and the idea of who is doing the act. If I'm simply making equipment available Breyer But it should work out in a parallel way. That is, when I look at the program, I am making a copy of the program, and therefore I am violating the non-exclusive right, the exclusive right to copy. Now, if that's fair use and therefore I can do it, it should also be fair use if exactly the same thing happens, but it comes from a cloud. Frederick But let me — let me further answer your question about music, because I omitted a key distinction, which is that for local radio broadcasts, there is a music distribution license that's under Section 115 of the Copyright Act. Breyer  115c3 is what I was going to say. But that's the whole — that is exactly the same way satellite and cable work as well, so that if you're broadcasting in the local area, you — it is for free. It is like a copyright-free zone. And the reason for that in the music world is because they want local radio broadcasters to play songs because that drives sales of the records. That's a totally different business model, of course, than in the television world. But the reason why this matters for your perspective is that what the Court, the Second Circuit in Cablevision, did was it said user-specific, user-initiated copies are private performances, they are not public performances. And the only way you're saying that AT&T system, Netflix, Hulu, all of those systems get their content and they don't push it down to you, they do exactly what you do. They let you choose what you want to see. Yeah. The difference is that they do not exclude anyone. And the difference, the public-private distinction from property law is whether or not there's a right to exclude. If I have private property, I exclude others. If I have public property, I'm not excluding others. Netflix, Hulu, those other services, they're not excluding anyone. As a user of those services, I have no right to exclude anyone else. And so they are making their product, their content available to all without exclusion, other than the subscription that you pay. What we're doing is providing the equipment that enables people to access it. Now, the only distinction that's been offered to us is that they're not excluding anyone else. Ginsburg, you are seeking subscribers, legions of subscribers, so I don't understand that. You say they have to be – are you selective in that some people who want to use your service are going to be turned down? You're not. You'll take anybody you can pay, right? Sure. And if we went around to 1,000 or 10,000 homes in Brooklyn and we put up antennas, installed their DVRs for them, and we sent them a monthly bill every month to pay us because we had performed that service and provided that equipment, it would be the exact same position, Justice Ginsburg, and that can't be a copyright violation. Now, the only distinction the government has offered for why cable vision decision in the Second Circuit, and this goes to your question, Justice Kennedy, somehow should be different here, is in the supposed lawfulness of the first instance in which that content is received. That distinction can't work and would imperil the cloud. Here's why. When a person is accessing local over-the-air broadcast television, it's doing so because that is free public spectrum. And Sony says we have a fair use right in order to make a copy of that free use. The government in the Fort Knightley case argued that there is an implied-in-law license when a person accesses local over-the-air telecasts in that way. So it can't be the distinction between our situation and cable vision that there is somehow some difference, because if I'm watching local over-the-air broadcast TV in my home, I don't have to pay a royalty for it. And that's exactly the analogy that would be appropriate there. Now, how would that affect the cloud? Well, if you turn every type of performance that an individual makes from some content that gets downloaded or transferred from the cloud, the cloud provider can't tell what's legal or what's not legal. Some stuff could be up there pirated. Some stuff could be up there perfectly licensed. And what the position of the other side in this case is, those people are liable for direct infringement of the public performance right. And that's why the cloud industry is very concerned that if you have too expansive an interpretation of what is the public performance right, you are consigning them to potentially ruin its liability. Kagan Mr. Frederick, why isn't it sufficient to create a line such as the one Mr. Clement said, which said, do you on the one hand supply of provide the content, that puts you on one box, on the other hand, if you're not supplying or providing the content, if the users are supplying and providing the content, and you're just providing a space, a kind of platform for them to do that and for them potentially to share the content, that puts you in another box? Frederick Well, Justice Kagan, I note that my friend did not reference the words of the transmit clause at all when he offered that distinction. And that's actually quite important, because in order to get there, you have to make up words to put them in the transmit clause. But even if you were to think that that was good for a policy reason, you'd still have to explain why the hundreds of thousands of people that are subscribers to Aerial Service don't have exactly the same fair use right to get over-the-air broadcast content than all of those people who are not Aerial subscribers, but they happen to have a home antenna and a DVR. Those people have every bit of his right to get that access, and the fact that they are doing it doesn't make their antenna or their antenna provider a content provider. As I said ---- Ginsburg So why do people pay for the Aerial Service if they do the same thing all by themselves? Frederick Because if you don't have to buy a TV, a DVR, and an antenna, and a sling box, which might cost you thousands of dollars, you might pay $100 to rent it, or if you want to just look at programming selectively, you pay $8 a month. It's a rental service, Justice Ginsburg. That can't change the copyright analysis. And just because you rent equipment does not transform the person that is providing that equipment into a public performer, particularly when you are the one who initiates every set of signals that activates the programming and the content. If there are no further questions, we'll submit. Thank you, counsel. Mr. Clement, you have 3 minutes remaining. Thank you, Mr. Chief Justice. Just a few points in rebuttal. First, I just have to correct just a fundamental difference. Mr. Frederick says, as he did in his red brief, that if you only ---- if you are a cable company and you only retransmit locally, you don't have to pay a royalty. That's just wrong, as we point out in the reply brief. There is a minimum royalty that every cable company pays whether or not they transmit distant signals. So that's just wrong. Second, this is not a case, as Mr. Frederick would like to say, where the user pushes a button and then after that point, Aereo is just a hapless bystander. And if you want an insight into what actually happens behind the scenes, is the phrase the district court used, look at pages 64A to 67A of the Petition Appendix, because Judge Nathan explains all the things that Aereo does after the consumer presses the button and before it comes back to them on their home screen. They are not just a passive bystander. Also, this whole notion of what's volitional. Maybe in the reproduction concept, in the context, just pushing a button, there's only one person who reproduces, but the concept of what is the requisite volitional conduct is answered by the transmit clause. Congress specifically looked at this and said there are going to be lots of situations where the sender, usually the cable company or Aereo, sends a transmission to the user, and the sender of that transmission, if it allows a contemporaneous performance, unlike the record company, they are a transmitter, they are publicly  Sotomayor, tell me the consequences of our decision today. Do you put them out of business, or do they have to go and negotiate a license with every copyright holder? You're in fact telling me they're not a cable company, they're not a satellite company, so they can't go into those systems of payment. What happens now? The consequences really gets back to the Chief Justice's question, which is if they actually provide something that is a net benefit technologically, there's no reason people won't license them content. But on the other hand, if all they have is a gimmick, then they probably will go out of business and nobody should crioteer over that. Breyer. Once you take them out of the compulsory licensing system, they're going to have to find copyright owners who owns James Agee's pictures, who owns something that was written by like a French silent film in 1915. I mean, the problem is that they might want to have perfectly good things that people want to watch and they can't find out how to get permission. That is a problem that worries me, and it worries me again once you kick them out of the other systems. It's not a problem that should worry you because, first of all, if they really need a compulsory license, maybe Congress can revisit it as it has in technologically specific ways for cable and satellite. But there is other ways to get content. They could approach HBO. So the second circuit is that they want to say that this whole case is about reproduction and there is no public performance going on at all. And to understand how crazy that is, with all due respect, if they approach HBO and say we would like to carry your content and provide it as a premium service, they would be telling HBO, by the way, we don't need a public performance license. All we need is a reproduction license, because we don't involve ourselves in any public performance at all. And that's why, at the end of the day, their argument simply blinks reality. They provide thousands of paying strangers with public performances over the TV, but they don't publicly perform at all. It's like magic. Thank you, Your Honors. Roberts. Thank you, counsel. Counsel, the case is submitted.